KUNKEL et al., Appellants and cross-appellees.

v.

## BOARD OF COMMISSIONERS OF CHAMPAIGN COUNTY, Appellees and cross-appellants.

[Cite as *Kunkel v. Champaign Cty. Bd. of Commrs.*, 177 Ohio App.3d 718, 2008-Ohio-4017.]

Court of Appeals of Ohio,
Second District, Champaign County.

Nos. 2007 CA 19 and 2007 CA 20.

Decided Aug. 8, 2008.

720

Brad C. Singer, for appellants Robert A. Kunkel, Nancy A. Kunkel, and Regina Current.

Wanda L. Carter, for appellant Johnson Township Board of Trustees.

James F. Peifer, for appellees Terry C. Howell et al.

Nick Selvaggio, Champaign County Prosecuting Attorney, and Scott D. Schockling, Assistant Prosecuting Attorney, for defendant Board of Commissioners of Champaign County.

---

DONOVAN, Judge.

{¶ 1} This matter is before the court on the notices of appeal of Robert A. Kunkel, Nancy A. Kunkel, and Regina Current (collectively "Kunkel"), and the Johnson Township Board of Trustees ("Johnson"). On September 19, 2007, we consolidated the parties' appeals. On October 1, 2007, appellees, Terry C. Howell et al. (collectively "Howell"), filed a brief in opposition, and on October 16, 2007, Johnson filed a reply.

{¶ 2} The events giving rise to this matter began on December 16, 2005, when the Champaign County Board of Commissioners received a petition from James F. Peifer, Esquire, as agent for Howell, for the annexation of 358.099 acres, more or less, to be annexed from Johnson and Jackson townships to the village of St. Paris, Ohio, which comprises approximately 475 acres. On February 16, 2006, the village council issued resolution 1021, itemizing in relevant part the services that the village would provide to the territory proposed to be annexed as follows:

{¶ 3} "(a) Police service will be provided on a 24-hour basis;

{¶ 4} "(b) Water and sewer service will be made available to properties within the annexation area upon the area becoming a part of the Village. Services will be provided at inside Village rates."

{¶ 5} The board held a hearing on the petition on March 7, 2006. On March 28, 2006, the board approved the annexation, and that decision was appealed to the Champaign County Court of Common Pleas, pursuant to R.C. 709.07 and R.C. Chapter 2506; the trial court affirmed the board's decision on May 30, 2007.

{¶ 6} The property at issue includes a 260-acre parcel in Johnson Township ("the eastern parcel") and a 97-acre parcel in Jackson Township ("the western parcel"). The eastern parcel is contiguous to the village for approximately 2,600 feet. The eastern parcel contains some residential lots, as well as some industrial

and business development at its western edge. It is roughly rectangular in shape and its southwestern corner adjoins the northeastern portion of the western parcel. The western parcel in shape resembles an inverted stair step. It is situated to the west of State Route 235, while the eastern parcel is situated to the east of State Route 235 and south of State Route 36. Terry C. Howell owns the western parcel, which is undeveloped. Howell wants to develop his property with houses and condominiums.

{¶ 7} Several people testified at the hearing on the petition. Jack Purk, a Johnson Township Trustee, strongly opposed the annexation, arguing that the distance from the village to the western parcel would create problems in terms of adequate police and fire protection and that any residential growth in the village should occur "right against St. Paris," rather than at the outer limits of the intervening eastern parcel.

{¶ 8} Tim Purk, the Johnson Township zoning inspector, testified that the proposed housing development will be adjacent to the business development at the west end of the eastern parcel. Purk noted that the county comprehensive plan states that industrial areas should be buffered from residential areas.

{¶ 9} Dave Zimmerman, the fire chief of the AFP fire district, described the fire-hydrant system that services the area as a "dead-end line." Zimmerman testified that he performed a pressure test on the last hydrant on the line, which is at the western end of the eastern parcel, and he found a drop in water pressure. Zimmerman expressed concern about having adequate pressure to service the western parcel. According to Zimmerman, "It's a consideration that needs to be known and a consideration that has to be known once we started development and get into those type of issues in that area." At the conclusion of the hearing, Zimmerman again stated, "My point is if we're going to have the developments and increase the development, increase population where I have to supply life safety, those elements should be in place before annexation and not after annexation."

{¶ 10} Mayor Braden of the village stated that the eastern parcel only contains eight homes and one business, and an "additional eight homes and one business I don't see being a challenge for our police department to handle even though it is a mile and a quarter outside of the Village. I believe it's a much better situation for all of the entities out there, all of the homes and the businesses because right now who knows where their Sheriff, Deputy Sheriffs could be within the County." The mayor further testified that the village plans to obtain new water towers as follows: "[W]e currently are working with our state senators both on working for funding for this tower. They have all been contacted again this year. We talked to them last year. * * * [T]he funding did not happen last year but we are in line for funding this year to be put onto appropriations federally. Again, who

knows how all of that will work but if that does work basically the water tower would be placed out in the industrial park that's out there and the big picture is to have the return line run back down the railroad bed which would take care of the situation that the Fire Chief pointed out where it's a dead end. It wouldn't be a dead end." The mayor also testified that the costs of "the extensions," namely the "streets, sidewalks, storm sewer, water, sewer lines all of that will be at the developer's costs, so the cost to the Village is—I don't know if I want to use the word nothing but very minute."

{¶ 11} In response to a question regarding the water tower, the mayor stated, "[T]he ideal situation is to have a water tower on each end of town and to loop the whole service as the Fire Chief pointed out, which is the perfect situation." According to the mayor, the village is applying for grants for two towers.

{¶ 12} Joe Sampson, who runs the water and sewer plant in the Village, testified that the plant has been free of violations for two years since new management was hired, and that any past violations have been corrected. Sampson stated, "[R]ight now, we have a half a million gallon capacity sewer plant. And we have, right now have an average flow of about 260,000. So we have plenty of room for development."

{¶ 13} At the conclusion of the meeting, Peifer responded to some of the concerns that were expressed. In response to Zimmerman's concerns, Peifer stated, "[G]ranting annexation does not accomplish anything. We have the same situation after the annexation as we have before. All annexation does in this case is allow the developers to take the action that's necessary to satisfy the requirements of the comprehensive plan and that includes dealing with the infrastructure improvements if those have to be made. My point is that the infrastructure is available to serve the territory now. It is out at 235 and 36 * * * in close proximity with * * * any development that would take place out there."

{¶ 14} Peifer conceded that the territory to be annexed is large, but not unreasonably so, noting, "[I]t is largely rural and farmland at this point—and it is in an area currently served or very close to areas which are served by sewer and water." Peifer noted that the concerns about buffering the proposed development from the industrial area are zoning issues and are not the proper subject of an annexation proceeding. When asked about any potential "downside" to the annexation, Peifer stated that the residents located within the annexed territory will have to pay village income tax. He reiterated that the "improvements that take place to serve the facilities that come in are going to be paid for either by developers or they'll be paid for with grant money."

{¶ 15} Kunkel's and Johnson's assignments of error are nearly identical and will be considered together. Kunkel's sole assignment of error is as follows:

{¶ 16} "The trial court erred in affirming the county commissioner's approval of the annexation of 358.099 acres to the village of St. Paris in that the court's decision is unsupported by a preponderance of the substantial, reliable and probative evidence on the record as a whole."

{¶ 17} Johnson's sole assignment of error is as follows:

{¶ 18} "The trial court erred by finding that the granting of the annexation petition by the board of commissioners of Champaign County was supported by substantial, reliable and probative evidence found within the record."

## I. Statutory Framework

{¶ 19} "Annexation by municipalities of adjacent territory is encouraged in the State of Ohio." *Smith v. Bethel Twp. Bd. of Trustees,* Miami App. No. 2002–CA–32, 2003–Ohio–466, 2003 WL 203594, ¶ 9. " 'Annexation is strictly a statutory process.' *In re Petition to Annex 320 Acres to the Village of S. Lebanon* (1992), 64 Ohio St.3d 585, 591, 597 N.E.2d 463. Consequently, the procedures for annexation and for challenging an annexation must be provided by the General Assembly." *State ex rel. Butler Twp. Bd. of Trustees v. Montgomery Cty. Bd. of Cty. Commrs.,* 162 Ohio App.3d 394, 2005–Ohio–3872, 833 N.E.2d 788, ¶ 8. " '[T]he enactment in 1967 of R.C. 709.033 substantially curtailed the discretion to be exercised by the boards of county commissioners in such proceedings. That statute establishes specific standards to be applied by the board to the evidence before it in annexation proceedings, and grants to the board the discretion to make only those factual determinations specifically called for in the statute.' " *Smith v. Granville Twp. Bd. of Trustees* (1998), 81 Ohio St.3d 608, 613, 693 N.E.2d 219, quoting *Lariccia v. Mahoning Cty. Bd. of Commrs.* (1974), 38 Ohio St.2d 99, 101–102, 67 O.O.2d 97, 310 N.E.2d 257.

{¶ 20} "In reviewing an administrative appeal under R.C. Chapter 2506, the common pleas court must weigh the evidence to determine whether the decision made by the agency was supported by a preponderance of reliable, probative, and substantial evidence. * * * 'While the inquiry is essentially a legal question as to the presence or absence of the necessary quantum of evidence, it is a hybrid form of review; it inevitably involves a consideration of the evidence * * *. Thus, to a limited extent, a substitution of judgment by the reviewing common pleas court is permissible.' " *Jeter v. Montgomery Cty. Bd. of Commrs.,* Montgomery App. No. 19746, 2003–Ohio–3832, 2003 WL 21674967, ¶ 5, quoting *In re Annexation of 1,544.61 Acres* (1984), 14 Ohio App.3d 231, 233–234, 14 OBR 259, 470 N.E.2d 486.

{¶ 21} "The court of common pleas' decision may then be appealed to an appellate court '*on questions of law* as provided in the Rules of Appellate

procedure.' (Emphasis added.) Under R.C. 2506.04, however, the scope of the appellate review is much more limited." *Granville,* 81 Ohio St.3d at 613, 693 N.E.2d 219, quoting R.C. 2506.09. It has been defined as follows: " 'An appeal to the court of appeals, pursuant to R.C. 2506.04, is more limited in scope and requires the court to affirm the common pleas court, unless the court of appeals finds, as a matter of law, that the decision of the common pleas court is not supported by a preponderance of reliable, probative and substantial evidence.' " Id., quoting *Kisil v. Sandusky* (1984), 12 Ohio St.3d 30, 34, 12 OBR 26, 465 N.E.2d 848. "The court of appeals has a more limited function in determining whether the standard of review was correctly applied by the common pleas court. The court of appeals does not weigh the evidence but considers whether, as a matter of law, the trial court judgment is against the weight of the evidence." *Jeter,* 2003–Ohio–3832, 2003 WL 21674967, at ¶ 5. "Thus, we must determine whether the trial court's judgment was supported by some competent and credible evidence." *In re Petition for Annexation of 131.983 Acres* (July 7, 1995), Miami App. No. 94–CA–15, 1995 WL 418694.

{¶ 22} R.C. 709.033(A) sets forth the applicable criteria for approving an annexation. The statute consists of six subsections, each containing criteria that must be met before annexation will be granted. The criteria at issue herein are set forth in R.C. 709.033:

{¶ 23} "(A) After the hearing on a petition for annexation, the board of county commissioners shall enter upon its journal a resolution granting the annexation if it finds, based upon a preponderance of the substantial, reliable, and probative evidence on the whole record, that each of the following conditions has been met:

{¶ 24} " * * *

{¶ 25} "(4) The territory proposed to be annexed is not unreasonably large.

{¶ 26} "(5) On balance, the general good of the territory proposed to be annexed will be served, and the benefits to the territory proposed to be annexed and the surrounding area will outweigh the detriments to the territory proposed to be annexed and the surrounding area, if the annexation petition is granted. As used in division (A)(5) of this section, 'surrounding area' means the territory within the unincorporated area of any township located one-half mile or less from any of the territory proposed to be annexed."

{¶ 27} Kunkel and Johnson argue that the territory annexed is unreasonably large, that the good of the annexed territory will not be served, and that the detriments to the territory annexed outweigh the benefits.

## II. Unreasonably Large

{¶ 28} " 'The issue of what constitutes an "unreasonably large" area of territory which is to be annexed is not numerically or geographically defined in

the statute.'" *In re Petition for the Annexation of 315.118 Acres, More or Less in the Twp. of Xenia* (March 20, 1998), Greene App. No. 97 CA 76, 1998 WL 127512, *6, quoting *In re Annexation of Territory in Olmsted Twp.* (1984), 14 Ohio App.3d 260, 263, 14 OBR 289, 470 N.E.2d 912. "Whether an area is 'unreasonably large' is a question of fact to be resolved by the tests of proportionality, capacity to successfully serve, and injury to the area from which the land is annexed * * *." *Allen v. Miami Cty. Bd. of Commrs.* (June 25, 1992), Miami App. No. 91CA38, 1992 WL 141924, *4.

{¶ 29} "Ohio courts have adopted a three-prong test to determine whether a territory is unreasonably large.

{¶ 30} " '(1) The geographic character, shape and size (acreage) of the territory to be annexed in relation to the territory to which it will be annexed (the city), and in relation to the territory remaining after the annexation is completed (the remaining Township area); * * *

{¶ 31} " '(2) The ability of the annexing city to provide the necessary municipal services to the added territory. (Geographic as well as financial 'largeness' may be considered. * * *)

{¶ 32} " '(3) [T]he effect on remaining township territory if annexation is permitted. If the territory sought to be annexed is so great a portion of the township's tax base that the annexation would render the remaining township incapable of supporting itself, then the Board might reasonably conclude the proposed annexation is unreasonably large, although such annexation would benefit the territory sought to be annexed.'" *Twp. of Xenia,* 1998 WL 127512, *6, quoting *Herrick v. Bd. of Cty. Commrs.* (Jan. 23, 1980), Summit App. No. 9425.

## A. Geographic Character, Shape, and Size

{¶ 33} According to Kunkel, the "instant case is a clear situation in which size does matter." Kunkel argues that "the testimony and evidence considered by the Board * * * shows no consideration of the size of the proposed annexation as compared to the current size of the Village." According to Johnson, the western parcel "hangs by a thread" to the eastern parcel, and Howell "is attempting to leap-frog over this larger territory, for which annexation is of no (or little) interest, in order to annex and develop territory that is not otherwise contiguous to the Village. Were this annexation to be allowed, it would extend the Village boundary to the west by approximately 2.2 miles. * * * The shape of this territory, with a dangling residential development that is remote from the Village and its services is an element requiring a finding that the territory is 'unreasonably large.'" Johnson further argues that the trial court erroneously

applied "a 'contiguity' standard," as a basis for its determination that the property is not unreasonably large, rather than analyzing the property's shape and size.

{¶ 34} In affirming the petition for annexation, the trial court determined that Jackson Township "will be reduced in size by less than one percent, and that Johnson Township will be reduced in size by 'less than two percent.'" According to the court, "insofar as the 358.099 acres compares to the remainder of Johnson and Jackson Townships, the size of the annexation territory is not unreasonably large." The court further determined, "[I]f annexation is successful, the Village of St. Paris will increase in size by roughly seventy-five percent," noting, "numerous annexations of larger parcels have occurred."

{¶ 35} The court went on to note that it "has been unable to find an example of a municipality successfully increasing its size by as large a percentage as in the present case," citing a case in which a village added 50 percent more acreage in an annexation. *In re Petition of Annex 320 Acres to the Village of S. Lebanon* (1992), 64 Ohio St.3d 585, 597 N.E.2d 463. The court found that "the shape of the annexation does *not* constitute a 'shoestring' or a 'balloon on a string,'" citing *Twp. of Xenia,* and that the "annexation territory is contiguous with the present boundaries of St. Paris for approximately 2,600 feet." The court noted the "roughly rectangular" shape of the eastern portion. The court further noted that "the major concern involves the 'western portion' of the territory," and it determined that "'the western portion' is sufficiently connected to the 'eastern portion' and that no 'connecting strips of land' are utilized to meet contiguity requirements in the present case." The court concluded that the geographic character, shape, and size of the territory are not unreasonably large.

{¶ 36} Johnson is correct that the trial court analyzed the proposed annexation for compliance with contiguity requirements. ("A shoestring annexation has been described as one 'where excessively long, narrow strips were utilized to connect outlying areas.'" *Twp. of Xenia,* 1998 WL 127512, at *3, quoting *In re Petition to Annex 95 Acres to Nelsonville* (C.P.1997), 84 Ohio Misc.2d 20, 29, 682 N.E.2d 734). But this is of no consequence. In fact, "[t]he Supreme Court examined the first prong in *Middletown v. McGee* (1988), 39 Ohio St.3d 284, 287, 530 N.E.2d 902, from the basis of configuration and contiguity of the proposed area." *In re Petition for Annexation of 131.983 Acres* (July 7, 1995), Miami App. No. 94–CA–15, 1995 WL 418694. Importantly, the record reveals that the trial court properly analyzed the parcel's shape and size, noting the small percentage of township property involved and noting that larger parcels had previously been annexed. We note that an odd configuration of a parcel alone does not support a denial of annexation and that "even isolated islands of land are not enough to cause rejection of an annexation petition if the decision to

create them was not unreasonable." *Golonka v. Bethel Twp. Bd. of Trustees* (Dec. 8, 2000), Miami App. No. 2000–CA–33, 2000 WL 1803636, citing *Trissell v. Bethel Twp. Bd. of Trustees* (Dec. 12, 1997), Miami App. No. 97–CA–35, 1997 WL 762953. We conclude that the record reveals that the trial court properly considered the geographic character, shape, and size of the annexed parcel in the context of its "unreasonably large" analysis.

### B. Ability to Provide Services

{¶ 37} Johnson and Kunkel argue, in reliance upon Zimmerman's testimony, that the village will be unable to provide fire protection to the annexation territory and that the mayor's assertion regarding the installation of new water towers was based upon mere speculation. Kunkel argues that the "trial court's finding that 'a preponderance of the evidence supports a conclusion that the territory would benefit from the Village's provision of police protection' is not supported by evidence in the record."

{¶ 38} The court determined that the village "has the ability to provide the necessary municipal services." In terms of sewer and water, the court acknowledged the concerns about the village's ability to provide these services, but determined, "to the extent the village is unable to provides these services, said services are not 'necessary,' " citing *Moore v. Union Twp. Bd. of Twp. Trustees* (2003), 152 Ohio App.3d 535, 789 N.E.2d 252, and *Smith v. Bethel Twp. Bd. of Trustees,* 2003–Ohio–466, 2003 WL 203594. In *Moore,* we relied upon *Bethel Twp. Bd. of Trustees* in determining that an inability to provide city sewer service to the annexation area did not provide a basis to deny annexation where the property owners in the territory to be annexed used septic tanks, rendering sewer services unnecessary. In *Bethel Twp. Bd. of Trustees,* Stephen and Rosemary Hammer owned 37 acres that did not enjoy the benefit of sanitary sewer service; we determined, "[W]e will not deny this annexation petition based on a hypothetical proposal which would make certain services necessary in the future. Instead, we feel we must focus on what services are necessary to the territory currently. Since the territory does not currently have sanitary sewer service, we find this is strong evidence that sanitary sewer service is not a necessary service for this territory." 2003–Ohio–466, 2003 WL 203594, ¶ 14.

{¶ 39} The trial court found, "[P]rovision of water and sewer services would likely not be available without annexation of the territory." The court noted, "[T]here are plans to extend the water and sewer lines and 'loop' the system so as to alleviate the 'dead-end' line concerns * * *." Finally, the court found, "[T]estimony revealed a water line from the Village currently runs along a significant portion of the proposed annexation territory and that this supports a finding that the Village would logically expand in that direction."

{¶ 40} In terms of fire protection, the court noted the concerns of Fire Chief Zimmerman regarding "the low water pressure in certain fire hydrants, as well as the 'dead-end' water lines currently in existence." Despite Zimmerman's concerns, the court determined, the "evidence demonstrates that, at worst, there will be no loss in services to the area (both that to be annexed and the surrounding area). At best, with the extension of adequate water lines and hydrants, it appears fire protection would improve."

{¶ 41} The court noted that testimony regarding police protection was lacking in the record, since no representative from the St. Paris police department or the Champaign county sheriff's office testified, although Johnson township's representative testified there were currently very few St. Paris officers on duty at any given time. The court noted that the resolution states that St. Paris will provide police services on a 24–hour basis. The court also relied on the mayor's testimony that the additional eight homes and one business in the eastern parcel of property would not be a "big challenge for our police department."

{¶ 42} We note that in *Moore* and *Smith* our analyses of the ability to provide municipal services was based upon a separate section of the annexation statute that has since been amended (discussed below), and which required a determination by the commissioners that no material benefit which the land currently enjoys will be lost if the proposed annexation takes place.

{¶ 43} We further note, "[T]he trial court's review is limited to a determination of whether the Board's decision was supported by the evidence, not whether the evidence might have supported a different decision." *In re Petition for Annexation of 550.626 Acres, More or Less, From Butler Twp., Montgomery Cty., & Union Twp., Miami Cty., to the City of Union, Ohio* (Dec. 9, 1992), Montgomery App. No. 13398, 1992 WL 361909. We conclude that it was reasonable for the trial court to consider the village's resolution committing to provide the services listed as competent, credible evidence that the city could in fact provide those services. It was also reasonable to rely upon the mayor's testimony regarding the village's ability to provide police and fire protection, as well as Sampson's testimony regarding the available capacity at the sewer plant. As the trial court correctly noted, some of the infrastructure needed for the provision of fire protection and water already exists; there is a water line from the village that runs along the majority of the territory to be annexed. The trial court also properly found that plans are in place to obtain grants for new water towers to accommodate future growth, and there is no evidence of any impediment that would prohibit the provision of services. See *In re Appeal of Borean* (July 21,1999), Delaware App. No. 99CAH–01–003, 1999 WL 668569 (determining the party challenging annexation must do so "by way of actual evidence that the city is unable to provide adequate services, and not mere speculation that services

may not be offered, or that promised improvements may not be made"), but cf. *Butler Twp., Montgomery Cty., & Union Twp., Miami Cty.* (affirming denial of annexation petition in part because the Stillwater River floods several times a year making impassable the main roadway connecting the annexation territory to the city); see also *In re Appeal of Annexation of 65.48 Acres in Springfield Twp. to the Village of Holland, Springfield Twp.* (June 20, 1997), Lucas App. No. L–96–301, 1997 WL 341760 (affirming determination that territory to be annexed was unreasonably large where the territory was separated from the village by a heavily traveled highway and railroad tracks thereby impeding the village's ability to provide public services).

{¶ 44} In conclusion, the record affirmatively demonstrates that the trial court properly considered the village's ability to provide municipal services.

### C. Effect on Remaining Township Territory

{¶ 45} Evidence regarding the effect on the remaining territory if annexation is permitted was not presented below, perhaps because the townships will lose such a small percentage of property in the annexation process, and this element is not at issue in this consolidated appeal. The trial court determined, based on the insignificant percentage of change in the largely rural property of the townships, that it "cannot find that this potential reduction in the townships tax revenue is so staggering that it threatens the townships' abilities to continue functioning as viable entities." We conclude that the trial court properly considered the effect of the annexation on the remaining township properties.

{¶ 46} Finally, having reviewed the record, we conclude that the trial court's judgment that the parcel of property annexed was not unreasonably large is not against the weight of the evidence.

### III. The General Good

{¶ 47} "Although the broad discretion once possessed by boards of county commissioners in annexation proceedings has been curtailed by R.C. 709.033, the question of whether the proposed annexation would serve the general good of the territory to be annexed is a factual finding within the statute and, as such, its determination remains committed to the discretion of the board. * * * The board must consider both the benefits and detriments of annexation upon the proposed annexation territory in making this determination. * * * In cases where there is conflicting evidence on the issue of general good, the board's decision must stand." *Jeter*, 2003–Ohio–3832, 2003 WL 21674967, ¶ 10.

{¶ 48} Kunkel and Johnson argue that the trial court applied the wrong standard in determining that the annexation will serve the general good. In 2002, Ohio's annexation laws were amended, as mentioned above, altering the

"general good" requirement. Johnson also argues, "[T]he fact that there are many owners within the annexation territory who do not support the annexation (a clear detriment of annexation) should have been considered in a weighing of benefits and detriments."

{¶ 49} In granting the petition for annexation, the trial court initially determined, in reliance upon *Moore*, citing *Brahm v. Beavercreek Twp. Bd. of Trustees* (2001), 143 Ohio App.3d 205, 757 N.E.2d 857, " 'In considering the general good of the property to be annexed, the commissioners do not have to be presented with evidence that the annexation will produce a discernable benefit to the land annexed; rather, they must be shown merely that no material benefit which the land currently enjoys will be lost if the proposed annexation takes place.' " In a footnote, the court noted, citing *Antwerp v. Bd. of Cty. Commrs. of Paulding Cty, Paulding*, App. No. 11–04–10, 2005–Ohio–3517, 2005 WL 1606319, "[T]he *Brahm* decision was rendered under the previous version of R.C. 709.033." *Village of Antwerp* held, "Under the most recent version of R.C. 709.033, the annexation must result in the territory to be annexed receiving some sort of benefit and that benefit must outweigh any detriments." 2005–Ohio–3517, 2005 WL 1606319, at ¶ 23.

{¶ 50} The trial court herein noted that the commissioners are to " 'consider what is good for the territory, not what is "best" for the territory, and the commissioners are to do so for the entire territory and should not give sway to a single owner's preferences.' " Further, the court noted that the board " 'is to give great weight to the wishes of the landowners to be annexed in deciding what is in their general good.' " It was of significant import to the court that " '*whether an annexation is for the general good of the area to be annexed remains a factual determination within the discretion of the board.*' " (Emphasis sic.) In the event of conflicting evidence, the decision of the board must stand, the court determined.

{¶ 51} In considering the evidence before it, the court noted that the owners who signed the petition own approximately 80 percent of the total area proposed for annexation "in addition to constituting a numerical majority of owners." The court also considered that significant opposition to the annexation existed, noting with emphasis in a footnote, however, that "a great deal of that opposition focused more on the *anticipated* residential *development* of the 'western portion' as opposed to the actual annexation of the territory in question. The court further notes that annexation does not guarantee this development will occur." The court determined that although the western portion is some distance away from the village, the "annexation does not violate the concept of municipal unity." The court noted the significant development, estimated at a 26 percent increase, in the area around the village in the last 15 years, determining that the proposed

annexation complies with the county comprehensive plan promoting growth "within Villages and cities as opposed to splitting off parcels from rural areas."

{¶ 52} According to the court, "[T]here is no material benefit which the land (both the proposed annexation territory and 'the surrounding area') currently enjoys that will be lost if the annexation takes place. Thus, * * * pursuant to *Moore*, the Commissioners' finding that the general good will be served is supported by a preponderance of substantial, reliable, and probative evidence. Further, under the test explained in *Village of Antwerp*, * * * the Court finds that the land will enjoy benefits not otherwise available, such as provision of water and sewer services, and police protection provided by the Village of St. Paris.

{¶ 53} "On balance, the benefits to the proposed annexation territory and the surrounding area outweigh any detriments. Considering the factors discussed above, the Court finds the Commissioners' conclusion that the general good will be served is supported by a preponderance of reliable, substantial and probative evidence."

{¶ 54} Having reviewed the record, we note that the court makes clear that it applied the proper test, citing *Antwerp*. Regarding Johnson's arguments that the court failed to properly consider the desires of those opposed to annexation, we note that the cases cited by Johnson are distinguishable. In *Hottle v. Barney* (Nov. 22, 1995), Montgomery App. No. 15126, 1995 WL 695035, 43.5 acres were annexed to the city of Miamisburg from Miami township. Hottle, who owned more than half of the land to be annexed, along with the township, sought an injunction, which the common pleas court granted. An agent for the petitioner filed a notice of appeal, and we affirmed the trial court, noting, "[T]he territory described in the petition involved thirty-two owners, of which twenty-three owners signed the petition, but the intentions and desires of the remaining owners, including Hottle, *who owned most of the territory*, were reasonably entitled to great weight in the consideration of the benefits and detriments to the totality of the territory." (Emphasis added.) Here, as the trial court noted, "the owners who signed the petition own a significant majority of the total area proposed for annexation in addition to constituting a numerical majority of owners."

{¶ 55} Johnson also directs our attention to *Olmsted Twp. Bd. of Trustees v. Berea* (1999), 134 Ohio App.3d 688, 731 N.E.2d 1219. In *Olmsted Twp.*, property owners sought to enjoin an annexation of around 190 acres. On remand from a previous appeal, the trial court enjoined the annexation. The city of Berea appealed, and the board of trustees and property owners cross-appealed. The judgment of the trial court was affirmed. Joseph and David Hollo owned a 71-acre horse farm in the area to be annexed, and the trial court determined that

annexation of their property "would adversely affect [their] legal rights or interests."  The agent for the petitioners for annexation admitted self-interest, stating "that he seeks annexation to increase his property value and the 'developability' of the property, and that configuration of the one-hundred-ninety-acre parcel excluded [other property at the owner's request], but included the Hollo property to increase value to the proposed future development."  Herein there is no evidence that any property owner's legal rights or interests will be adversely affected merely to increase the value of the anticipated development of the western parcel.

{¶ 56} The trial court reasonably concluded that the board's decision regarding the general good was supported by a preponderance of reliable, probative, and substantial evidence.  Therefore, we will not disturb this determination on appeal.

{¶ 57} There being no merit to Johnson's and Kunkel's assignments of error, they are overruled.

Judgment affirmed.

GRADY and GLASSER, JJ., concur.

GEORGE M. GLASSER, J., retired, of the Sixth District Court of Appeals, sitting by assignment.